IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF WYOMING

PAUL DOUGLAS MATHEWSON,

Plaintiff, Pro Se

26 cv 202-SWS

v.

MIKE MASCARO, individually and in his official capacity;

CASEY FRIEND, individually and in his official capacity;

DEVIN JAHAD, individually and in his official capacity;

PAT CORNWELL, Chief of Police, individually and in his official capacity;

JERIMIE KRAUSHAAR, Sheriff of Hot Springs County, individually and in his official capacity;

ADAM ESTENSON, Mayor, individually and in his official capacity;

THE TOWN OF THERMOPOLIS;

DOE DEFENDANTS 1–10 (Including participating municipal and state officials);

Defendants.

**COMPLAINT FOR VIOLATION OF CIVIL RIGHTS AND DEMAND FOR JURY TRIAL**

I. INTRODUCTION

1. This is a civil rights action brought under 42 U.S.C. § 1983 and the Fourth, First, Fourteenth, and Fifth Amendments to the United States Constitution. Plaintiff Paul Douglas Mathewson seeks compensatory and punitive damages, as well as declaratory and injunctive relief, against the Town of Thermopolis, Hot Springs County officials, and individual law enforcement officers for a coordinated, decades-long campaign of harassment, excessive force, unconstitutional property seizures, evidence spoliation, and the bad-faith, involuntary taking of Plaintiff's primary residence.

II. JURISDICTION AND VENUE

2. This Court has subject matter jurisdiction over Plaintiff's federal constitutional claims pursuant to 28 U.S.C. § 1331 (Federal Question Jurisdiction) and 28 U.S.C. § 1343(a)(3) and (4) (Civil Rights Jurisdiction).

3. Venue is proper in the United States District Court for the District of Wyoming pursuant to 28 U.S.C. § 1391(b)(1) and (2), as all Defendants reside or are located within the State of Wyoming, and a substantial part of the events, acts, and omissions giving rise to Plaintiff's claims occurred within Hot Springs County, Wyoming.

III. PARTIES

4. Plaintiff Paul Douglas Mathewson is a resident of Thermopolis, Wyoming, and at all times relevant to this complaint, held an equitable ownership interest in the residential riverfront property that is the subject of this litigation.

5. Defendant Town of Thermopolis is a municipality incorporated under the laws of the State of Wyoming. It is responsible for the policies, customs, and practices of its Town Council, legal representatives, and Police Department.

6. Defendant Adam Estenson is the Mayor of the Town of Thermopolis. He is sued in his individual and official capacities.

7. Defendant Pat Cornwell is the Chief of Police for the Town of Thermopolis. He is sued in his individual and official capacities.

8. Defendant Jerimie Kraushaar is the Sheriff of Hot Springs County. He is sued in his individual and official capacities.

9. Defendant Mike Mascaro is a police officer employed by the Town of Thermopolis. He is sued in his individual and official capacities.

10. Defendant Casey Friend is a Deputy employed by the Hot Springs County Sheriff's Office. He is sued in his individual and official capacities.

11. Defendant Devin Jahad is a Deputy employed by the Hot Springs County Sheriff's Office. He is sued in his individual and official capacities.

12. Defendants Doe 1 through 10 are presently unidentified municipal, county, or state officials, agents, or employees who participated in, conspired to execute, or ratified the constitutional violations alleged herein. Plaintiff will amend this complaint to state their true names and capacities once ascertained through discovery.

IV. FACTUAL ALLEGATIONS

A. Plaintiff's Equitable Ownership and Rehabilitation of the Property

13. For approximately 12 years, Plaintiff maintained exclusive, continuous possession of a residential property spanning 3.5 riverfront lots in the Town of Thermopolis, Wyoming.

14. During this time, Plaintiff established an undeniable equitable ownership interest in the property. Plaintiff entered into a purchase arrangement with the legal deed holder, Alan Webber, providing a $10,000 motor home as a direct down payment.

15. Plaintiff personally paid all property taxes, water, sewer, garbage, and utility assessments. Furthermore, Plaintiff made massive financial and physical investments to rehabilitate the property, including removing raw sewage, abating severe black mold, and completely replacing the furnace, hot water heater, and basement plumbing to ensure the residence was safe for human habitation.

16. Plaintiff's equitable interest was formally investigated and documented by the State of Wyoming during the administration of Supplemental Nutrition Assistance Program (SNAP) benefits, wherein the State verified with deed holder Alan Webber that Plaintiff was actively purchasing the home.

B. The 2006–2022 Harassment and Fabricated Criminal Charges

17. Recognizing the value of Plaintiff's 3.5 riverfront lots, the Town of Thermopolis initiated a coordinated and continuous campaign of harassment aimed at dispossessing Plaintiff of his property and driving him out of the municipality.

18. This campaign included subjected Plaintiff to excessive scrutiny, unwarranted police contacts, and malicious prosecution.

19. In 2022, Defendants subjected Plaintiff to fabricated criminal charges in an attempt to incarcerate him and sever his ties to the property.

20. These criminal charges lacked probable cause and were ultimately dismissed on July 1, 2022, following a blatant abuse of process by local law enforcement and prosecuting authorities.

C. The 2022–2026 Vehicle Impounds, Retaliatory "Nuisance" Prosecution, and Surveillance

21. Having failed to sustain the fabricated criminal charges in 2022, the Town of Thermopolis escalated its retaliatory campaign by weaponizing municipal code enforcement and towing authorities against Plaintiff.

22. From late 2022 through 2026, the Town conducted an ongoing campaign of unlawful Fourth Amendment seizures by impounding a minimum of seven vehicles belonging to Plaintiff. The Town unlawfully and falsely designated these vehicles as "abandoned" despite them being parked directly in front of Plaintiff's own residence. Furthermore, Hot Springs County Sheriff Jerimie Kraushaar was actively complicit in this campaign of harassment, establishing, ratifying, or permitting policies that allowed deputies to assist and participate in the unconstitutional impounding of Plaintiff's vehicles under the fabricated pretext of being "abandoned."

23. The Town's coordinated campaign of harassment was not merely about code enforcement; it was driven by a premeditated, illicit motive to seize Plaintiff's valuable riverfront property, vehicles, motorcycles, lawn care machinery, antique furnishings, antique dishes, antique pottery and tools, et al.

24. The Town Attorney explicitly confessed this malicious intent to Plaintiff on at least two separate occasions. Approximately two years prior to the final eviction, the Town Attorney stated during a telephone conversation that he was going to take Plaintiff's property. The Town Attorney later repeated this direct threat to Plaintiff in person while exiting a courtroom, proving the subsequent municipal actions were part of a calculated land grab.

25. In one particularly egregious instance of unconstitutional seizure, which Plaintiff captured on video, the Town's agents initiated an impound and towed a vehicle while Plaintiff was physically occupying it, demonstrating a reckless disregard for Plaintiff's constitutional rights and physical safety.

26. In December 2023, Plaintiff was actively engaged in a lawful construction project on his property, specifically replacing the roof of a large, three-bay garage and constructing an adjoining carport. The property lawfully contained standard construction materials, including pallets of shingles, lumber, flashing, and a dump truck utilized for roofing debris.

27. Immediately following a major snowstorm, the Town issued Plaintiff a generic "nuisance" citation. The initial notice completely failed to identify the specific nature of the alleged nuisance, leaving Plaintiff unaware that the Town was unlawfully targeting his active building materials and equipment.

28. The Town subsequently issued a second notice. In a deliberate attempt to violate Plaintiff's Fourteenth Amendment rights to procedural due process and adequate notice, the Town printed the descriptive details of the allegations in "Type 1" font. This microscopic text was visually indistinguishable from a shadow or a crease in the paper, intentionally depriving Plaintiff of the ability to read the charges against him.

29. At the subsequent town hall meeting and municipal trial, it was revealed that the Town of Thermopolis had conducted unlawful, warrantless aerial surveillance of Plaintiff's private residence using a drone, in direct violation of Plaintiff's Fourth Amendment right to be free from unreasonable searches of the curtilage of his home.

30. During the trial, the Town relied on this illegally obtained drone footage and presented dangerously vague accusations regarding multiple vehicles on Plaintiff's property, failing to specify makes, models, unit numbers, or prove a lack of registration.

31. The municipal trial itself was fundamentally flawed and violated Plaintiff's due process rights. The Town Attorney actively suborned perjury, coaching witnesses to provide false testimony to secure a conviction.

32. Specifically, neighbors were coached to testify regarding pest infestations (skunks and raccoons) that they subsequently admitted on the stand they had never actually seen.

33. Furthermore, a neighbor who purchased her property in 2023 was coached to falsely testify that Plaintiff's property caused a $10,000 depreciation in her home's value. Official county tax records obtained by Plaintiff prove this testimony was perjury, as the neighbor's property value had actually increased by $40,000 during that exact time frame.

34. Despite the due process violations, the hidden charges, and the unconstitutional surveillance, the municipal court convicted Plaintiff, imposing the maximum fine of $750.00.

D. The July 2024 Selective Enforcement and Destructive "Abatement" Raid

35. In July 2024, weaponizing the aforementioned manufactured nuisance conviction, the Town executed a massive, public, and highly destructive "abatement" raid on Plaintiff's property.

36. The Town deployed seven municipal workers, a garbage truck, a front-end loader, and a mini skid steer to systematically seize, crush, and destroy Plaintiff's exterior personal property.

37. This aggressive deprivation of property was maliciously timed to occur while Plaintiff was actively in the process of erecting a 100-foot privacy fence. The Town specifically executed the raid just before the privacy fence could be completed to ensure maximum exposure and public humiliation and to try and be compliant with the taking. Town administrator (Jim) specifically said "if I try and make it compliant before they arrive with equipment they would tear down fence and or gates to take or destroy personal property".

38. The Town's actions constituted blatant selective enforcement in violation of the Equal Protection Clause. Numerous neighboring properties exhibited significantly worse yard conditions, yet the Town exclusively targeted Plaintiff's active construction site to facilitate their overarching goal of property theft. In fact, the city has never proceeded with nuisance and abatement against any others.

39. This highly public raid was designed to inflict maximum degradation and financial suffocation, causing Plaintiff such severe emotional distress and physiological trauma that he physically broke out in hives the day it occurred.

40. Demonstrating a coordinated municipal intent to attack the property's legal standing and force Plaintiff from his home, the Town immediately, within a week of conviction of Mathewson, attempted to initiate similar nuisance proceedings against Alan Weber, the legal deed holder from whom Plaintiff was purchasing the residence.

41. Following this tainted conviction and physical raid, the Town weaponized the $750 yard nuisance fine to unlawfully attack Plaintiff's driving privileges. The Town issued a notice threatening to suspend Plaintiff's driver's license if the fine was not paid "by September 13th." Plaintiff fully complied with this directive, paying the $750 fine on September 13th.

42. Despite Plaintiff's compliance, the Town unlawfully suspended his license, relying on a bad-faith, semantic trap claiming that "by September 13th" legally meant before the 13th. The Town utilized this manufactured administrative pretext to claim Plaintiff owed an additional reinstatement fee.

43. Three weeks later, acting on this manufactured suspension, the Town executed a highly coordinated, retaliatory strike. Officers intentionally waited until a Friday to initiate a traffic stop. Five police officers surrounded and arrested Plaintiff for a first-offense driving under suspension.

44. Under Wyoming law, a first-offense driving under suspension is a citable, forfeitable offense that does not typically warrant a custodial arrest. However, the Town deployed five officers and specifically timed the arrest for a Friday to maliciously ensure Plaintiff would be incarcerated in the county jail over the entire weekend.

E. The Harassment of Plaintiff's Service Animal and Escalation of Pretextual Stops

45. The Town's coordinated harassment extended to targeting Plaintiff's physical disabilities and his dog, Larry. Plaintiff suffers from Multiple Sclerosis (MS) and is a survivor of two strokes, conditions fully known to local law enforcement.

46. While Plaintiff was lawfully riding his bicycle with his 100-pound dog, multiple officers aggressively escalated a minor encounter by pulling a police cruiser into the middle of the street to block Plaintiff's path.

47. Officers weaponized Plaintiff's medical conditions and the dog's natural inclination to walk the remaining block to his home as false evidence that Plaintiff "lacked control" of the animal. Officers subsequently surrounded Plaintiff and issued a retaliatory "dog at large" citation.

F. The February 2025 Excessive Force, Illegal Search, Sexual Assault, and Failure to Intervene

48. On February 12, 2025, Plaintiff was driving to the town hall to pay the aforementioned dog citation when Defendant Mascaro initiated yet another pretextual traffic stop. Defendant Mascaro justified the stop by relying on the previously manufactured driver's license suspension glitch.

49. Upon initiating the stop, Defendant Mascaro immediately escalated the encounter to violence. He forcefully extracted Plaintiff from the vehicle, falsely claiming he had to execute an immediate physical arrest because Plaintiff's dog was in the truck and was "dangerous."

50. Demonstrating premeditation and a consciousness of guilt, Defendant Mascaro intentionally marched Plaintiff to the rear of the truck and pinned him against the tailgate, specifically positioning Plaintiff in a blind spot to conceal the impending assault from the police cruiser's dash camera and his own body-worn camera.

51. Defendant Mascaro applied handcuffs excessively and maliciously tight. He then began violently wrenching and twisting Plaintiff's wrists.

52. While Plaintiff was defenseless in handcuffs, Defendant Mascaro committed a physical and sexual assault under the color of law. Mascaro repeatedly and forcefully yanked Plaintiff's cuffed hands backward and upward directly into Mascaro's groin, executing this abusive maneuver four to six times.

53. To manufacture a false narrative of resistance for any audio recording devices, Defendant Mascaro repeatedly shouted, "Quit tensing up or I'll have to put you down!" while actively inflicting pain and cranking on the handcuffs.

54. As a direct result of Mascaro's excessive force and wrenching of Plaintiff's arms, Plaintiff suffered severe physical injuries, including a fully torn rotator cuff, for which Plaintiff documented photographic and video evidence of his immediate injuries upon arrival at the police station.

55. Proving that the "dangerous dog" justification used to aggressively extract Plaintiff was a fabricated pretext, immediately after securing Plaintiff in the police cruiser, Defendant Mascaro voluntarily entered Plaintiff's truck with the dog. While inside, Mascaro conducted an unlawful, warrantless search of the vehicle's glove compartment and seized Plaintiff's wallet, an unconstitutional search captured on the cruiser's dash camera.

56. During the physical assault, Hot Springs County Sheriff's Deputy Casey Friend arrived on the scene at a high rate of speed. Deputy Friend ran behind Plaintiff's truck and immediately engaged in excessive force by kicking Plaintiff in the back of the leg, violently slamming Plaintiff's shin into the vehicle's trailer hitch.

57. Following this strike, Deputy Friend stepped back and stood by, actively watching Defendant Mascaro continue the physical and sexual assault. Deputy Friend had a realistic opportunity to

prevent the ongoing constitutional violations but maliciously and deliberately failed to intervene.

58. The law enforcement agencies involved have subsequently and intentionally refused to release Deputy Friend's body camera footage, which captured the assault and the illegal search in their entirety, further evidencing a coordinated municipal cover-up.

G. Warrantless Surveillance, Protected Activity, and the April 2, 2025 Fire

59. In addition to physical harassment, the Town of Thermopolis engaged in long-term, warrantless surveillance of Plaintiff's residence. For approximately ten months, the Town operated a pole camera directed at the rear of Plaintiff's property, continuously recording the curtilage, the garage, and Plaintiff's primary points of entry.

60. Plaintiff affirmatively confirmed the camera's presence, marking it with paint. Suspiciously, the Town abruptly removed this unconstitutional surveillance device merely two to three days prior to a catastrophic fire on Plaintiff's property that occurred on April 2, 2025.

61. Following the February 2025 physical and sexual assault by Defendant Mascaro, Plaintiff engaged in constitutionally protected First Amendment activity by reporting the assault to state authorities in Cheyenne and formally filing for a protection order.

62. The Town immediately retaliated. On the very first business day following Plaintiff's filing for a protection order, the Town maliciously terminated the electrical utilities to Plaintiff's residence.

63. On April 2, 2025, a devastating fire destroyed Plaintiff's garage. During this emergency, the Town and its agents engaged in willful interference and a subsequent cover-up.

64. Plaintiff possesses sworn evidence that 911 emergency services were deliberately suppressed. Neighbors attempting to report the fire were met with interference; independent verification from the cellular provider (Verizon) confirmed these emergency calls failed to connect to local towers. Furthermore, the outgoing call logs for these emergency attempts were inexplicably erased from the neighbors' mobile handsets.

65. While emergency calls were being suppressed, video evidence captured by a neighbor depicts a first-responder unit meandering toward the fire at a slow, non-emergency speed (approximately 10–15 mph) without sirens or lights, directly contradicting the urgent response required for a structure fire.

66. To conceal this coordinated deprivation of emergency services, municipal officials, including the Chief of Police and the Fire Department, subsequently fabricated the official response timeline reported to the Wyoming State Fire Marshal in Cheyenne.

H. The June 9, 2025 Arson, 911 Interception, and Destruction of the Primary Residence

67. The Town's retaliatory campaign culminated on June 9, 2025, in the catastrophic destruction of Plaintiff's primary residence, his motorhome, his truck, and his patio, as well as the tragic death of Plaintiff's two pet cats.

68. At the time the fire ignited, Plaintiff had been out of town for approximately 36 hours purchasing electrical components to restore his power. Because the Town had previously severed the electrical utilities, the property lacked the power or active gas necessary to naturally ignite an accidental fire of this magnitude.

69. Upon arriving at the active fire, Plaintiff witnessed an off-duty law enforcement officer, Deputy Devin Jahad, dressed in street clothes, conspicuously emerging from and fleeing the non-fire side of Plaintiff's residence. This presence strongly implicates local law enforcement in the intentional ignition of the fire.

70. Just as with the April fire, the Town utilized cellular interception technology to suppress the emergency response. A neighbor's 911 call was maliciously intercepted and intentionally routed to the Worland Fire Department, 35 miles away, delaying the response by at least ten critical minutes.

71. Furthermore, the outgoing 911 call logs on the neighbor's handset were once again wiped. This digital spoliation of evidence was witnessed and officially noted by investigators from the Wyoming Division of Criminal Investigation (DCI) and the Wyoming State Fire Marshal's office, implicating state and local agencies in an active cover-up of the suppression of emergency communications.

72. The Town of Thermopolis Fire Department's response to the June 9 fire demonstrated absolute, malicious, and deliberate indifference to Plaintiff's life and property. The Town dispatched only a single fire apparatus, which proceeded to dump its water payload directly into the street rather than applying it to the structure.

73. Firefighters on the scene willfully refused to fight the fire. With open flames destroying the rear of the residence, firefighters maintained dry hoses and actively "took a break," leaving Plaintiff to attempt to suppress the structure fire with a low-pressure garden hose.

74. Demonstrating a shocking and constitutionally violative disregard for human life, the Fire Chief explicitly admitted to Plaintiff on the scene that the fire department had purposefully failed to conduct a search and rescue operation of the interior of the home. When confronted about Plaintiff's two trapped cats, the Chief callously responded, "Was there someone in there?"

75. Further demonstrating that the Town's primary objective was the malicious targeting of Plaintiff rather than public safety, three Town of Thermopolis police officers were actively observed trespassing in Plaintiff's backyard while the structure fire was actively raging.

76. Instead of assisting with emergency suppression, evacuation, or crowd control, these three officers were witnessed conducting an unlawful, warrantless search of Plaintiff's property by running Vehicle Identification Numbers (VINs) on a truck parked near the flames. An independent eyewitness observed this unconstitutional search and physically sprayed the officers with water while they prioritized running VIN numbers over a catastrophic structure fire.

77. It is unequivocally clear that had Plaintiff been inside the residence asleep, the Town of Thermopolis Fire Department and Police Department would have deliberately allowed him to burn to death while they inventoried his property. The Town's coordinated actions constitute a state-created danger that resulted in the total loss of Plaintiff's home and the death of his animals.


I. The Unlawful Condemnation, Bad-Faith Sale, and Utility Blockade

78. Following the fires, Plaintiff actively attempted to mitigate damages and restore the property. The primary residence remained structurally sound; the most severe damage was limited to the secondary patio and the fire department's unnecessary and deliberate destruction of the interior ceilings.

79. Plaintiff expended over $1,000.00 on materials to properly rebuild the electrical meter box mount and wire it into the breaker panel. However, demonstrating extreme bad faith and proving the forthcoming "condemnation" was a pretext for theft, the Town intentionally sabotaged Plaintiff's repairs. The Town explicitly forbade contractors from inspecting the new electrical installation and refused to allow the gas company to reinstall the meter, falsely claiming the Town already owned the house.

80. The Town's forced deprivation of electricity directly resulted in further physical injury to Plaintiff. On January 1, 2026, navigating his backyard in total darkness due to the Town's utility blockade, Plaintiff tripped and fell. This fall severely exacerbated the full tear of Plaintiff's rotator cuff—an injury initially and directly caused by Defendant Mascaro's excessive force.

81. Rather than remediate the state-created danger, the Town posted a "condemnation" notice on the property merely eight days after the fire. This notice was facially unconstitutional. It cited no specific statute, lacked an inspection report by a fire chief or building official, offered no opportunity for remedy, and falsely labeled Plaintiff a "squatter."

82. The Town's claim that Plaintiff was a "squatter" was a knowingly fabricated pretext. For 12 years, Plaintiff maintained exclusive, continuous possession of the property and established an

undeniable equitable ownership interest. Over this 12-year period, Plaintiff personally paid all property taxes, water, sewer, garbage, and utility assessments.

83. Furthermore, Plaintiff made massive financial and physical investments to make the property habitable. Plaintiff provided a $10,000 motor home as a direct down payment. Plaintiff personally financed and executed the removal of raw sewage, abated severe black mold, and completely replaced the furnace, the hot water heater, and all basement plumbing to ensure the residence was safe for human habitation.

84. The Town's assertion that Plaintiff lacked official ties to the property is directly contradicted by formal, state-stamped documentary evidence. The State of Wyoming, during an administration of Supplemental Nutrition Assistance Program (SNAP) benefits, conducted a formal investigation and officially verified with the deed holder, Alan Webber, that Plaintiff was actively purchasing the home.

85. Furthermore, following the April 2025 garage fire, Plaintiff was formally sued in a subrogation lawsuit by the property's insurance carrier, serving as a binding institutional acknowledgment of Plaintiff's equitable ownership and established control over the property.

86. Despite this overwhelming evidence, the Town published defamatory notices in the local newspaper falsely claiming this meticulously maintained property was "abandoned," while concurrently holding private, executive-session town council meetings to coordinate an involuntary, bad-faith purchase of the property.

87. Mayor Adam Estenson and the Town Council, meeting in private executive sessions, knowingly orchestrated this involuntary purchase, personally authorizing the bad-faith acquisition to facilitate the theft of Plaintiff's property.

88. Upon discovering the Town's intent to execute this sale on September 10, 2025, Plaintiff submitted two formal demand letters to the Town Council asserting his equitable interest. Further proving Plaintiff's equitable ownership, Plaintiff paid $800.00 to bring the water utility entirely current just three days prior to the Town's involuntary purchase of the property.

89. On September 24, 2025, Plaintiff submitted an emergency filing for a Temporary Restraining Order (TRO) to the state court to enjoin the unlawful sale. However, the court unlawfully delayed docketing this emergency filing until October 17, 2025.

90. Exploiting this judicial delay, the Town abandoned its statutorily deficient condemnation process and executed a bad-faith, involuntary purchase of the property directly from the deed holder, Alan Webber, on October 10, 2025, acquiring the 3.5 riverfront lots for an artificially deflated price of $22,500.

91. The state court subsequently compounded the deprivation of Plaintiff's due process. On November 27, 2025, the court issued a notice setting a "trial on the merits" based solely upon

the now-expired TRO. The court intentionally excluded all underlying unconstitutional actions from the scope of the hearing.

92. On December 16, the exact day of the unlawful trial on the merits, the Town maliciously terminated Plaintiff's gas service. Despite the gas utility being fully current and in Plaintiff's name, the Town deliberately severed the heating source in a calculated, retaliatory attempt to "freeze out" Plaintiff during the winter.


J. The 2026 Eviction, Seizure of Personal Property, and Deprivation of Access to Courts

93. The Town finalized its theft of Plaintiff's property through a Forcible Entry and Detainer (FED) action, culminating in hearings in early 2026.

94. Throughout these proceedings, the Town Attorney engaged in bad-faith, improper service tactics. Specifically, the weekend prior to the pivotal March 30, 2026 hearing, the Town Attorney unlawfully bypassed the United States Postal Service and hand-stuffed a legal memorandum directly into Plaintiff's residential mailbox without postage, intentionally depriving Plaintiff of adequate time to review and respond.

95. Concurrently, Plaintiff filed a district court complaint under the Unlawful Occupied Property Act, seeking $140,000 to recover his stolen equity, labor, and financial investments in the property.

96. To prevent Plaintiff from appealing the unlawful FED eviction, the court imposed an exorbitant and prohibitive $10,000 supersedeas bond on an unrentable property that Plaintiff was already vacating, effectively blocking Plaintiff from exercising his right to appellate review.

97. Operating under the resulting Writ of Restitution, the Town escalated its physical harassment. The Town aggressively moved in, erecting concrete barriers and unlawfully seizing over $250,000 worth of Plaintiff's personal property. This massive deprivation included Plaintiff's Harley Davidson motorcycle, car trailers, utility trailers, lawn service equipment, and crucial work tools, effectively destroying Plaintiff's livelihood. It also resulted in the theft of irreplaceable family heirlooms, including 60 years of accumulated antiques from Plaintiff's mother and grandmother, jewelry, and photo albums.

98. To ensure Plaintiff could not recover his stolen property, Chief of Police Pat Cornwell unlawfully intervened in the civil property dispute. Operating entirely outside his legal jurisdiction, Chief Cornwell issued a retaliatory and unconstitutional "no trespass" order against Plaintiff, specifically weaponized to physically and legally bar Plaintiff from recovering his remaining personal estate.

99. Chief Cornwell immediately continued his targeted Fourth Amendment violations. When Plaintiff temporarily parked a car trailer and lawn tractor outside the property fence on the frontage to facilitate moving his remaining belongings, Chief Cornwell had the equipment

impounded within three hours. In executing these ongoing seizures, the Town engaged in blatant legal hypocrisy: weaponizing the frontage as a "public right-of-way" to justify towing Plaintiff's vehicles, while simultaneously claiming the exact same boundaries were "private property" to justify their bad-faith purchase and eviction.

100. During this forced removal, Plaintiff presented the state court and the Town with formal medical documentation proving he suffered from a fully torn rotator cuff and was medically unable to use his right arm to move his property. Demonstrating a shocking disregard for Plaintiff's documented disabilities, the presiding judge callously rejected the medical evidence and refused to grant Plaintiff any reasonable accommodation to secure his belongings, resulting in the total loss of his remaining personal estate.

101. To completely extinguish Plaintiff's First Amendment right to petition the government, the state district court summarily dismissed Plaintiff's $140,000 equity lawsuit. In executing this dismissal, the presiding judge explicitly and intentionally fabricated facts within his official written ruling.

102. The judge's written order falsely claimed that Plaintiff allowed the Town to proceed on the amended complaint without responding. Plaintiff possesses an independent audio recording of this hearing—which will be corroborated by the official court transcript—proving unequivocally that the judge falsified the factual record to orchestrate the dismissal of Plaintiff's legitimate claims.

103. To conceal this judicial misconduct, the state court issued a malicious Rule 11 threat, warning Plaintiff that any further filings to protect his property rights would result in punitive financial sanctions.

104. Having been completely and unlawfully dispossessed of his property, physically and sexually assaulted by law enforcement, robbed of his livelihood and family heirlooms, and systematically locked out of the local state court system through fabricated judicial rulings, Plaintiff now seeks relief from this United States District Court.


V. CAUSES OF ACTION

FIRST CAUSE OF ACTION

Violation of the Fourth Amendment (42 U.S.C. § 1983)

(Unreasonable Search and Seizure, Excessive Force, Failure to Intervene)

105. Plaintiff incorporates all preceding paragraphs.

106. Defendants, acting under color of state law, repeatedly violated Plaintiff's Fourth Amendment rights. This includes the unlawful seizure of Plaintiff's trailers, tractors, and

vehicles, unconstitutional ten-month pole camera surveillance, illegal search of Plaintiff's vehicle glove compartment, the warrantless search of vehicles during an active structure fire, and the weaponization of "no trespass" orders to facilitate property theft.

107. Furthermore, Defendant Mascaro and Defendant Friend utilized objectively unreasonable and excessive physical force against Plaintiff during the February 2025 traffic stop, executing a physical and sexual assault. Defendant Friend further violated Plaintiff's rights by failing to intervene to stop this unconstitutional assault.

SECOND CAUSE OF ACTION

Violation of the First Amendment (42 U.S.C. § 1983)

(Retaliation for Protected Speech and Petitioning the Government)

108. Plaintiff incorporates all preceding paragraphs.

109. Plaintiff engaged in constitutionally protected activity by reporting police misconduct, filing for a protection order, submitting demand letters to the Town Council, and filing lawsuits to protect his equitable property interests.

110. Defendants subjected Plaintiff to adverse actions—including terminating utilities, fabricating criminal affidavits, suspending driving privileges, erasing emergency call logs, and threatening punitive court sanctions—that would chill a person of ordinary firmness from continuing to engage in protected activity.

THIRD CAUSE OF ACTION

Violation of the Fourteenth Amendment (42 U.S.C. § 1983)

(Deprivation of Due Process, Selective Enforcement, and State-Created Danger)

111. Plaintiff incorporates all preceding paragraphs.

112. Defendants intentionally deprived Plaintiff of his liberty and property interests without due process of law. This includes the selective enforcement of municipal codes, bypassing statutory condemnation procedures, fabricating judicial rulings, ignoring documented medical accommodations, and intentionally intercepting 911 emergency communications to create a state-sponsored danger. The coordinated cover-up of the fire response by local and state agencies constitutes a deliberate indifference to Plaintiff's life, property, and civil rights.

FOURTH CAUSE OF ACTION

Violation of the Fifth Amendment (42 U.S.C. § 1983)

(Unconstitutional Takings Clause / Inverse Condemnation)

113. Plaintiff incorporates all preceding paragraphs.

114. Plaintiff possessed a recognized, equitable ownership interest in his residence. The Town of Thermopolis unlawfully seized this property through a bad-faith, involuntary purchase designed to bypass formal condemnation procedures and completely dispossess Plaintiff of his property without just compensation.


FIFTH CAUSE OF ACTION

Monell Liability (42 U.S.C. § 1983)

(Municipal Custom, Policy, and Failure to Train)

115. Plaintiff incorporates all preceding paragraphs.

116. The individual constitutional violations suffered by Plaintiff were the direct result of a widespread custom and policy of retaliation, evidence spoliation, and inadequate training tolerated, ratified, and encouraged by the Town of Thermopolis, rendering the municipality directly liable for all resulting damages.


VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter judgment against Defendants, jointly and severally, and grant the following relief:


A. Declaratory Relief: A declaration that the actions, customs, and policies of the Defendants violated Plaintiff's clearly established constitutional rights;

B. Compensatory Damages: An award of compensatory damages in an amount to be determined by a jury at trial, but in no event less than $1,000,000.00. This encompasses the $140,000.00 loss of property equity, the destruction of the physical structures, and the unconstitutional seizure and destruction of over $250,000.00 in personal property (specifically including a Harley Davidson motorcycle, utility and car trailers, commercial lawn service equipment, crucial work tools leading to a loss of livelihood, and irreplaceable family heirlooms and antiques). This amount also encompasses full compensation for physical injuries, the required shoulder surgery, lost wages, and the severe emotional distress inflicted by Defendants' coordinated campaign of harassment and life-threatening endangerment;

C. Punitive Damages: An award of punitive damages against the individual Defendants in their individual capacities, as their actions were driven by malice, reckless indifference, and a callous disregard for Plaintiff's federally protected rights;

D. Injunctive Relief: An order enjoining the Town of Thermopolis and its agents from engaging in further retaliatory harassment or unconstitutional surveillance of Plaintiff;

E. Costs and Fees: An award of all costs of litigation, including reasonable attorney's fees should Plaintiff retain counsel, pursuant to 42 U.S.C. § 1988;

F. Further Relief: Any and all further relief that this Court deems just and equitable; and

G. Reservation of Rights: Plaintiff expressly reserves the right to amend this complaint to add additional claims and named defendants as their identities and actions are revealed through discovery.


DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues so triable.


Respectfully submitted this 29th day of June, 2026.

Paul Douglas Mathewson

117 Fremont St.

Thermopolis, WY 82443

307-238-6261

Bigluvpm16@gmail.com

Plaintiff, Pro Se